# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA PANAMA CITY DIVISION

**JOHN S. WILLIS, JR.,**
    **Plaintiff,**

**v.**                                  **Case No. 5:12cv64/RS/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
    **Defendant**.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b), and NORTHERN DISTRICT OF FLORIDA LOCAL RULES 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83.

Upon review of the record before this court, I conclude that the Administrative Law Judge's ("ALJ") decision was not based upon substantial evidence. The decision of the Commissioner, therefore, should be reversed and the Commissioner ordered to grant the plaintiff's application for benefits.

## PROCEDURAL HISTORY

On March 30, 2009, John S. Willis, Jr. (who will be referred to by name, as plaintiff, or as claimant) protectively filed an application for supplemental security income, alleging disability beginning January 1, 2004.  T. 22, 46.[1]  The applications were denied initially and on reconsideration.  T. 22, 80-81.  Claimant sought an administrative hearing, which was held before an ALJ on July 8, 2011.  T. 42-79. Plaintiff appeared and testified at the hearing; John Black, an impartial vocational expert, also appeared at the hearing.  T. 48, 74.  In a decision dated July 25, 2011, the ALJ denied claimant's applications for supplemental security income, finding Mr. Willis had not been under a disability within the meaning of the Act from March 30, 2009, through the date of the decision.  T. 22-36.

Mr. Willis sought review by the Appeals Council, and filed supplemental briefing.  T. 4-5, 9, 18.  The Appeals Council denied the request for review on January 9, 2012.  T. 1-6.  This denial rendered the ALJ's decision the final decision of the Commissioner.  Plaintiff now seeks judicial review pursuant to § 1383(c) of the Act.

## FINDINGS OF THE ALJ

In his written decision the ALJ made several findings relative to the issues raised in this appeal:

1. The claimant has not engaged in substantial gainful activity since March 30, 2009, the application date.

---

[1]  The administrative record, as filed by the Commissioner, consists of nine volumes (doc. 6 through 6-8), and has 415 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

2. The claimant has the following severe impairments: bipolar disorder; depression; pain disorder; degenerative disc disease at L5-S1 with no acute processes; right sided neural foraminal narrowing T11-T12 related to a right paracentral disc bulge; diabetes mellitus with peripheral neuropathy; polysubstance abuse; and borderline intellectual functioning.

3. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

4. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) comprised of work that consists of only simple, routine, and repetitive tasks, consistent with a specific vocational preparation of 1 or 2, in an environment free of fast paced production requirements, involving only simple work-related decisions, with few, if any work-place changes and only occasional interaction with the general public.

5. The claimant has no past relevant work.

6. The claimant was born on July 23, 1965 and was 43 years old, which is defined as a younger individual age 18-49, on the date the application was filed.

7. The claimant has limited education and is able to communicate in English.

8. Transferability of job skills is not an issue because the claimant does not have past relevant work.

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 30, 2009, the date the application was filed.

T. 24-36.

## STANDARD OF REVIEW

A federal court reviews a Social Security disability case to determine whether the Commissioner's decision is supported by substantial evidence and whether the correct legal standards were applied by the ALJ. *See Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The court "'may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]'" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (*quoting Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot,

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, he is not disabled.

2. If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3. If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5. Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, he is not disabled.

The present case raises an issue as to step three. Accordingly, even though the ALJ performed the vocational analysis required at steps four and five, judicial review will focus upon the listed impairment issue. *See Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990) ("The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard. The listings define impairments that would prevent an adult,

regardless of his age, education, or work experience, from performing any gainful activity, not just 'substantial gainful activity.'") (Emphasis in original).

## FACT BACKGROUND AND MEDICAL HISTORY[2]

Claimant successfully completed school through the sixth-grade. T. 48. After sixth grade, however, claimant did not pass, but was socially promoted through the ninth-grade. T. 48. Following the ninth grade, claimant dropped out of school. T. 48. Claimant was unable to obtain a GED, and was unsuccessful at completing any further vocational training due to his limited mathematical ability. T. 49. Claimant has difficulty reading, but was able procure a driving license. T. 50. Currently, claimant resides in a small guest house behind his mother's house. T. 52. Claimant believes that the last time he had a job was when he was a roofer in Indiana in 1998 or 1999. T. 53. Claimant estimated that he made about $5000 a year as a roofer. T. 197. As a roofer, claimant worked eight hours a day, used machines, tools, or equipment, and did not employ technical knowledge or supervise people. T. 204.

When claimant was fourteen, he was charged with burglary and arson, and referred to Northwest Florida Mental Health Center. T. 401. There, on November 29, and December 5, 1979, the claimant underwent a series of mental evaluations. T. 401. The school counselor who administered the evaluations, Loretta Gray, noted that the claimant was uncooperative and reluctantly took part in the evaluations. T. 401. During the mental examinations, claimant would state that the questions did not make sense, or were weird, and would often respond to the questions asked to him

---

[2] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section. Because the issues raised by the claimant relate only to mental ability, little attention will be devoted to the physical maladies identified by the ALJ.

sarcastically or nonchalantly. T. 401. Claimant was administered the Wechsler Intelligence Scale for Children-Revised ("WISC-R") I.Q. test, and received a verbal score of 87, performance score of 69, and a full scale I.Q. score of 76. T. 402. Ms. Gray determined that the claimant was functioning within the borderline range of intellectual abilities. T. 402-03. In her summary of claimant's mental examination, Ms. Gray concluded that "[claimant] is experiencing a great deal of academic difficulty and frustration in the classroom due to his limited intellectual abilities and deficiencies in basic academic skills." T. 403. Ms. Gray also noted that plaintiff met the criteria for further evaluation for a specific learning disability. T. 402-03.

On February 28, 1980, claimant was referred to Northwest Florida Drug Council, Inc., for further mental evaluations. T. 405. There, claimant was evaluated using the Wechsler Intelligence Scale for Children ("WISC"), and obtained a verbal score of 100. T. 405. According to test administrator, James E. Hord, Jr., Ph.D., this verbal test score would place the claimant in the average range of performance. T. 405. On another series of tests administered by Dr. Hord, the claimant obtained significantly lower test scores in the areas of digit span, which is related to immediate recall functions. Dr. Hord believed that the limitations on recall could have been caused by claimant's glue sniffing. T. 405. Dr. Hord utilized the Bender Gestalt test, and found claimant had difficulty with angulation and the general reproduction of given designs. T. 405. This led Dr. Hord to again hypothesize some sort of organic impairment caused by sniffing glue. T. 405. Hord believed that such an impairment was acute and not chronic. T. 405-06. Dr. Hord further surmised that this glue sniffing had in fact mildly damaged claimant's brain. T. 406. In his report on the claimant, Dr. Hord noted that the claimant denied sniffing glue, but admitted to

making F's in school. T. 405. Following the administration of a personality examination employing the Rorschach Ink-Blot test, Dr. Hord expressed hesitancy in the test's validity due to the possibility of poor performance by the claimant occasioned by his inability to understand the questions. T. 405.

On April 1, 2008, claimant was admitted non-voluntarily to the Life Management Center of Northwest Florida, Inc., Crisis Stabilization Unit. T. 246. There, Vicki Alberts, M.D., found claimant to have future-oriented thought content, a logical and goal directed thought process, and claimant's memory and concentration to be intact/fair. T. 247. Dr. Alberts also found claimant's hygiene to be adequate, speech normal, and mental status sufficient for medical decision making. T. 247. Dr. Alberts evaluation was administered within the context of a referral for homicidal ideation and agitation. T. 246.

Over a year later on May 21, 2009, claimant was interviewed by Shawnna L. Patterson, M.D., Ph.D., at the Brain & Spine Center, L.L.C. T. 379-381. Dr. Patterson noted claimant's reading and writing ability to be within normal limits. T. 380. The plaintiff's memory, attention, and concentration were also found to be within a normal range. T. 380. Dr. Patterson further determined that the claimant had an eighth grade education and a "fair" fund of knowledge. T. 379-80. It appears from Dr. Patterson's recorded notes that the foregoing conclusions were reached in a general physical examination of the plaintiff for back pain. T. 380.

On April 9, 2009, claimant was interviewed by a social security claims adjudicator. T. 165-68. The adjudicator interviewed the claimant face-to-face and found that the claimant had difficulty understanding, concentrating, and answering during the interview. T. 166-67. Following these observations, the adjudicator noted

that the claimant didn't appear to have any physical problems walking, sitting or standing, but did have noticeable problems "remember[ing] information, such as jobs, medical, etc." T. 167. The claims adjudicator also noted the claimant had problems speaking at a normal pace and would seem to "just stare." T. 167. The adjudicator observed the plaintiff's clothes were worn and did not appear to be very clean. T. 167.

Shortly thereafter, on June 3, 2009, the claimant was seen by George L. Horvat, Ph.D., for a clinical evaluation with mental status. T. 292. Dr. Horvat made several observations, derived in part from various questions posed to the claimant:

> [Claimant's] attention was distractible, anxiety interfered with his concentration, and his memory was limited as he missed two of three items after five minutes. His organization was goal directed . . . . [Claimant] appeared to be of below average intelligence level based upon verbal and math skills demonstrated during the interview, and his fund of knowledge was limited by his intellect and his education . . . . His skill deficits are in the area of intellect and education, and his family is his main support. His social judgment was street smart, and he isolates due to his illness . . . . [Claimant] was unable to do his serial sevens, but he did his serial threes with five calculations in fifty-three seconds with two errors. He was unable to spell the word 'world' either forward or backward. When asked to name the last five presidents, he named four of the five, but he could not name the current vice president. When asked to name five large rivers, he named four of the five. When asked to explain the proverb about people who live in glass houses shouldn't throw stones, he said, 'They will break their house.' When asked to explain the proverb about a rolling stone gathers no moss, he said that he didn't know. When asked how apples and oranges are alike, he said that both are fruit and both have seeds. When asked to explain the difference between a child and a dwarf, he said, 'A child has years to go to be an adult, but a dwarf is a small person who is fully grown.' When asked, 'Do you think there is something wrong with you?' he answered, 'Yes, degenerative discs, diabetic neuropathy, and bipolar.

> I have seizures, and the last one was two weeks ago.  I always bite my
> tongue, and that's how I know I had one.'  When asked, 'What strengths
> do you have?'  After that question was explained, he replied, 'On a good
> day, I might be able to fix a dryer for you.'

T. 292-94.  Dr. Horvat also recorded that the claimant had clean clothes and adequate grooming.  T. 293.  In his observations of the claimant, Dr. Horvat noted that "[claimant's] skill deficits are in the area of intellect and education, and his family is his main support."  T. 294.  At the end of his examination, Dr. Horvat found the claimant capable of handling his finances, and concluded that claimant had "no psychological reasons why he cannot work.  His psychological treatment program can be scheduled around his work commitments."  T. 294.

Claimant was seen days later on June 11, 2009, by Owen D. Oksanen, M.D., who detailed that the claimant will on occasion look after his parents' yard, but will not do any of the cooking and cleaning.  T. 296.  Medically, Dr. Oksanen noted: 1) Depression with certain psychotic components of paranoia, agoraphobia, and anger management issues; 2) Reported episodes of mania, staying up for days without sleep culminating with reported, grand mall type seizures despite medications; 3) Complaint of low back pain and anxiety and Waddell's signs, but no other physical issues seen here; and 4) Diabetes and hypertension without a history of significant sequela, hospitalizations, "etc."  T. 298.  In his closing comments, Dr. Oksanen recommended claimant undergo a psychiatric examination.  T. 298.

In a psychiatric evaluation conducted on July 8, 2009, by James L. Myers, Psy.D., claimant was found to have the psychological impairments of Bipolar Ii disorder and depression.  T. 313.  Notably, Dr. Meyers left blank the portion of the

form detailing section 12.05, mental retardation. T. 314. After reviewing claimant's medical examinations and reports, Dr. Meyers believed claimant to be experiencing a mild to moderate decrease in mental functioning. T. 322. In his findings regarding claimant's daily routines and activities, Meyers found that claimant is independent, can prepare simple meals, perform routine household chores, shop, manage his finances, understand and complete simple one or two step instructions, could possibly perform better with well learned tasks, and properly function in a stable environment. T. 322, 324. Meyers did find, however, that claimant was distractible, with limited memory, and an estimated intelligence of below average. T. 322.

On October 6, 2009, claimant underwent another psychiatric evaluation, this time by Robert Stainback, Ph.D. T. 329. Dr. Stainback also left the section of the form detailing mental retardation blank. T. 333. In the section discussing claimant's Functional Capacity Assessment, Dr. Stainback noted that claimant has the mental capacity to remember work locations and procedures, and remember short, simple instructions. T. 345. Claimant can maintain a consistent work pace, follow a schedule, make simple work related decisions, and function at work without being distracted by coworkers or requiring additional supervision. T. 345. Claimant's ability to remember and follow more detailed instructions, however, is more problematic due to claimants reported cognitive limitations including difficulty concentrating for longer periods of time. T. 345. Dr. Stainback also listed possible problems with maintaining attention, holding concentration for extended periods of time, and the ability to plan independently and adapt to change. T. 345. In concluding his findings, Dr. Stainback found that "[c]laimant is able to meet the basic

mental demands of work on a sustained basis despite any limitations resulting from identified [medically determinable impairments]." T. 345. On October 9, 2009, days after Dr. Stainback's evaluation, claimant underwent a Physical Residual Functional Capacity Assessment by John A. Dawson, M.D. T. 347-54. Dr. Dawson reported that claimant acknowledged himself capable of mowing grass, fixing meals for himself, and shopping. T. 352. Dr. Dawson concluded that claimant's "maximum sustainable capacity would not reasonably be expected to exceed the RFC assessment as written." T. 352.

Germane to this appeal, further mental testing did not occur until after the hearing with the ALJ, when claimant's attorney requested further I.Q. testing to better discern claimant's mental capacity. T. 409. On September 16, 2011, claimant underwent additional mental examinations at the Life Management Center of Northwest Florida Inc. T. 413. Claimant had difficulty completing the initial questionnaire, but was cooperative with the examiner, David Smith, Ph.D., a licensed psychologist. T. 415. During the clinical interview, Mr. Smith found that claimant had marginal grooming and hygiene, organized thinking, and no suggestions of psychotic symptoms. T. 413. Claimant stated that he had been diagnosed with bipolar disorder, but was not receiving medication for the condition. T. 413. There was no evidence of mania or clinical depression. T. 413. Claimant did not describe any issues of substance abuse. T. 413. Dr. Smith noted claimant had a basic vocabulary, limited fund of knowledge, difficulty concentrating, inability to manage funds, and inability to operate a computer. T. 413-15. Dr. Smith concluded that claimant had "numerous signs of intellectual deficits." T. 414. Claimant was found

to have an I.Q. score of 53 under the Wechsler Adult Intelligence Scale - IV ("WAIS-IV"), which corresponds to extremely low levels of intellectual functioning. T. 414. Claimant also made numerous "reversals" in writing samples, which can sometimes be a reflection of a neurological impairment. T. 414. Claimant's I.Q. score attained from the examination may be a slight underestimate of his true I.Q. score because claimant struggled throughout the examination, often losing "patience and initiative." T. 414. In his conclusions, Dr. Smith noted that the low performance on the standardized I.Q. test and concurrent deficits in adaptive functioning both indicate that the claimant meets the criteria for mild mental retardation. T. 415. Dr. Smith posited that with such limitations, the claimant will have difficulty learning and performing semi-skilled tasks. T. 415. Dr. Smith also took issue with one of claimant's past I.Q. tests, finding that the test results obtained from Dr. Hord at the Northwest Florida Drug Council "are judged to be" invalid because the prorated scores were derived from nonrepresentative samples of sub-tests. T. 414.

In a third party function report, the claimant's mother described his daily activities as watching television and staying inside the guest house. T. 177. Claimant has one cat, which he feeds. T. 187. He prepares his own food on most days, but such food consists of sandwiches and frozen meals. T. 179, 188. Claimant's mother noted that he does not need special reminders to take care of his personal needs or hygiene, including taking his medication. T. 179. Claimant is on occasion able to do household chores and he is able to use public transportation. T. 188-89. He goes grocery shopping once a week. T. 189. His mother observed that claimant's disability leaves him unable to pay his bills, handle a savings account or "use a

checkbook/money order." T. 180. Claimant states, however, he can count change, handle a savings account, and use a checkbook/money orders. T. 189. According to the mother, claimant does not need to be reminded to go places, and does not need someone to accompany him. T. 181.

<u>HEARING BEFORE THE ALJ</u>

Claimant and vocational expert Black testified at the hearing held on July 8, 2011. T. 43-79. The ALJ questioned claimant about his educational attainment. T. 48. Claimant last successfully passed the sixth grade, but was socially promoted through the ninth grade before dropping out. T. 48. His brother bought him GED study books, but he could barely read them and therefore never obtained a GED. T. 48. He couldn't obtain a welding degree because his mathematical ability was too limited. T. 49. He has no other vocational training. T. 49. Claimant reads very little, and finds it quite difficult to read such magazines as People or Sports illustrated. T. 49-50. Claimant was able to pass a driver's license test, but his license is currently suspended due to alcohol use. T. 50-51. Claimant has enough proficiency in math to tell if he has received the correct change back from a purchase. T. 51. Claimant currently lives rent free in a small guest house behind his mother's house. T. 52. Currently, claimant has no income and is on food stamps. T. 55. His bills are in his mother's name. T. 55. He doesn't do odd jobs for petty cash anymore, but is able to mow his mother's lawn, often needing several breaks due to the severe pain in his back. T. 52-53. When questioned about his previous steady employment, claimant said he worked as a roofer in Indianapolis from 1994 through 2000. T. 54. Claimant has had other minor jobs during his life such as washing boats. T. 55. While living in Indianapolis, claimant was a home owner who had a mortgage of $350 or $400 per

month.  T. 55.  His wife at the time would assist in paying the mortgage.  T. 55. Around 2000, claimant was going through a divorce with his wife and having various personal problems, leading him to quit his roofing job.  T. 56.  Over the last few years, claimant has been living off of food stamps and living in a small apartment behind his mother's house.  T. 55.  When the ALJ asked about back problems, claimant responded "I have pain constantly in my back and I have trouble walking. A lot of times I'll be walking, and it ain't got to be far, I will get a sharp shooting pain down my knee.  And it will start hurting so bad I will have to stop walking for a while and then start back walking."  T. 56.  Due to his suspended license and back problems, claimant's primary mode of travel is public transportation.  T. 56.  The longer claimant walks the more likely he gets sharp shooting pains that force him to rest.  T. 56-57.  Discussing his history of alcoholism, claimant stated that he has drunk alcohol only four or five times in the last three years.  T. 57.

Claimant does take insulin and other medication for his diabetes, and determines the amount of medication he needs to take in the morning and at night based on a sliding scale.  T. 59.  Claimant also described at length his seizure disorder and blood pressure problem.  T. 59-64.  Regarding the amount of Depakote he takes, claimant was able to remember that he first took 500 milligrams before it was increased to 1,000 milligrams.  T. 63.  Claimant is able to take and record his blood sugar.  T. 65-66.  For a period of time, claimant followed a routine of monitoring and recording his blood sugar levels three times a day.  T. 66.  Plaintiff also gives himself injections of Lantus or Novolog.  T. 66-67.  During examination by his attorney, claimant described the pain he was then experiencing from his back condition, and

also went into greater detail about his blood pressure condition. T. 65-70. Finally, claimant described the significant pain he experiences on a daily basis and how daily activities such as sitting down or walking around could impact that pain. T. 70-73.

Vocational expert Black considered a hypothetical question featuring an individual of the same age, education, vocational background, and work capability as the claimant. T. 77. This individual would need work that was simple and routine, featuring repetitive tasks that are consistent with an SVP of 1 or 2. T. 77. Such an environment would need to be free of fast paced production requirements, very few workplace changes, and only occasional interaction with the public. T. 77. Mr. Black identified two such positions in the national economy. T. 77.

## ANALYSIS

Plaintiff raises one issue in this appeal, arguing that the Commissioner failed to properly evaluate Plaintiff's mental impairment pursuant to the 12.00 series listings. (Doc. 9, pp. 8-9). Plaintiff claims the Commissioner failed to consider new and material evidence submitted to the Appeals Council and that the underlying decision by the ALJ was not supported by substantial evidence. (Doc. 9, p. 9; Doc. 14, p. 1). Accordingly, he asks the court to reverse the decision to deny benefits or alternatively remand the case to the Commissioner for further proceedings with a different ALJ. (Doc. 9, pp. 14-15).

The Commissioner responds, arguing the Appeals Council properly considered the new evidence, and the ALJ's decision is supported by substantial evidence. Accordingly, says the Commissioner, remand for further consideration would be unwarranted. (Doc. 12, pp. 7-8).

The Appeals Council is required to evaluate the entire record, including the new and material evidence submitted, so long as the evidence relates to the period at or before the ALJ decision. *See Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); 20 C.F.R. § 404.970(b). To be "material," evidence must be non-cumulative, relevant, and probative of a claimant's condition during the time period for which benefits were denied, and there must be a reasonable likelihood that it would have changed the Commissioner's determination. *See Woolf v. Shalala*, 3 F.3d 1210, 1215 (8th Cir. 1993); *Milano v. Bowen*, 809 F.2d 763, 766 (11th Cir. 1987) (quotation omitted).

Here, the Appeals Council, by its own statement, "considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council." T. 2. The Appeals Council found that this information did not provide a basis for changing the ALJ's decision. T. 2. The referenced Order of Appeals Council contains two additional documents that were made part of the record, Exhibit 20E - Representative brief from Brian A. Dusseault, and Exhibit 26F - Psychological records from David J. Smith, Ph.D. T. 5. Thus, the Appeals Council, by its statement, considered this new evidence and found that it did not provide a basis for changing the ALJ's decision. The absence of detail underlying the Appeals Council's decision not to review the ALJ's decision, does not mandate remand. *See* 20 C.F.R. § 404.970(b); *see also Ridings v. Apfel*, 76 F. Supp. 2d 707, 709 (W.D. Va. 1999) (noting Appeals Council is not required to give detailed assessment of its failure to grant review after it has considered new evidence).

As for district court review in such a case, "a federal district court must

consider evidence not submitted to the administrative law judge but considered by the Appeals Council when that court reviews the Commissioner's final decision denying Social Security benefits." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1258 (11th Cir. 2007). In the Eleventh Circuit, "the denial of a request for review by the Appeals Council is part of the 'final decision' of the Commissioner . . . ." *Id.* at 1263 (agreeing with decisions of the Second, Fourth, Fifth, Eighth, Ninth, and Tenth Circuit Courts of Appeal). In the Eighth Circuit case cited in *Ingram* for this rule, the court said, "If, as here, the Appeals Council considers the new evidence but declines to review the case, we review the ALJ's decision and determine whether there is substantial evidence in the administrative record, which now includes the new evidence, to support the ALJ's decision." *Nelson v. Sullivan*, 966 F. 2d 363, 366 (8th Cir. 1992).

Plaintiff's only ground for reversal takes issue with the Commissioner's failure to find that plaintiff met the presumptive listing 12.05, Mental Retardation. Plaintiff argues that he met the requirements of the listed impairment during the relevant time period, and therefore should have been held disabled without more. The regulations promulgated by the Commissioner at Appendix 1, Subpart P, set out specific physical and mental conditions that are presumptively disabling. If a claimant meets the requirements of one of the listings, no further proof of disability is required. *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). "[The Eleventh Circuit] [has] determined that, to be considered for disability benefits under listing 12.05, a claimant must at least (1) have a significantly subaverage general intellectual functioning; (2) have deficits in adaptive functioning; and (3) have manifested

deficits in adaptive behavior before age 22." *Pettus v. Astrue*, 226 F. App'x 946, 948 (11th Cir. 2007) (*citing Crayton*, 120 F.3d at 1219). The Commissioner's listing at 12.05C provides as follows:

> 12.05 *Mental Retardation*: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A. B. C. or D. are satisfied.
>
> * * *
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpart P, App. 1 § 12.05.

*Plaintiff's I.Q. Score*

Turning to the first condition of 12.05C, "[Listing 12.00(B)(4)] provides that, where more than one IQ level is derived from the testing, *e.g.*, verbal, performance and full IQ's from [Wechsler Adult Intelligence Scale] testing, the lowest of these should be used in conjunction with 12.05." *Popp v. Heckler*, 779 F.2d 1497, 1499 (11th Cir. 1986). The ALJ, however, "[is] not required to find that [plaintiff] was mentally retarded based on the results of the IQ test. The ALJ is required to examine the results in conjunction with other medical evidence and the claimant's daily activities and behavior." *Popp*, 779 F.2d at 1500; *see also Clark v. Apfel*, 141 F.3d 1253, 1255 (8th Cir. 1998) (citing cases). Thus, the test results must be examined to assure consistency with daily activities and behavior. *Popp,* 779 F.2d at 1499;

*Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (*citing Popp*, 779 F.2d at 1499) ("[A] valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.").

This court must first address the additional evidence submitted by plaintiff to the Appeals Council. T. 413. The additional psychological evaluation by Dr. Smith occurred in September 2011 and subjected plaintiff to a wide variety of tests, including the WAIS-IV I.Q. test. T. 413. In addition to the I.Q. test administered by Dr. Smith, plaintiff was previously subjected to one full, and one partial I.Q. test, both over thirty three years ago. T. 401-04. The first full I.Q. test was given by a school counselor, Ms. Gray, when the plaintiff was fourteen years old. T. 401, 404. Ms. Gray, in her notes, stated that in the initial testing session, plaintiff was "very uncooperative and reluctantly participated in the testing activities[.]" T. 401. During the examination, plaintiff mentioned that the "tests did not make sense and the questions were weird. [Plaintiff] also responded to the test questions either sarcastically or nonchalantly." T. 401. The school I.Q. examination yielded a verbal score of 87, performance score of 69, and full scale I.Q. score of 76. T. 402.

Plaintiff had a partial I.Q. test only a few months after the first test. T. 405. This test was administered by Dr. Hord, who found plaintiff to have a verbal I.Q. estimate of 100, but a "significantly low sub-test score in the area of Digit Span which relates to immediate recall function." T. 405. Dr. Smith, in his later psychological evaluation, characterized Dr. Hord's I.Q. test as "invalid" because the

"prorated scores were derived from a nonrepresentative sample of subtests."[3]  T. 414.

In all, then, the first I.Q. examination was administered by a school counselor, over thirty years ago when the claimant was fourteen, and with reported difficulties in testing the plaintiff.  The second I.Q. examination was also completed over thirty years ago, only gauged the part of plaintiff's mental ability that he had historically tested well on, found significant difficulties in his recall memory, and was found to be invalid by Dr. Smith for using a nonrepresentative sample of sub-tests.  On the other hand, Dr. Smith's comprehensive I.Q. examination, given just after the hearing, found plaintiff to be well below the needed threshold with an I.Q. score of 53.  T. 414.  Acknowledging possibility of underestimation, Dr. Smith still found plaintiff met the criteria for Mild Mental Retardation.  T. 415.  Further, the large gap between plaintiff's I.Q. score of 53, and the threshold for 12.05(C), 70, is significant enough to suggest that even a more accurate evaluation of plaintiff's I.Q. would still be below the required level.

Dr. Smith's conclusion that plaintiff has mild mental retardation differs from the conclusion arrived at by the ALJ, Dr. Hord, and Ms. Gray.  T. 415.  Ms. Gray found the plaintiff to be within the borderline range of intellectual abilities.  T. 403. Her mental examination, and Dr. Hord's, are less reliable as indicators of plaintiff's mental ability than   Dr. Smith's examination,  for the reasons stated above. Nevertheless, the undersigned would note that the ALJ seems to have assumed the

---

[3]  Plaintiff's counsel posited that the "practice effect" of having a second I.Q. administration within three months of a prior administration artificially inflated plaintiff's I.Q. scores.  T. 9.  This contention, however, has not been recognized by any doctor in the instant case, nor is it supported by the record.  It is therefore not determinative in this matter.

applicability of Ms. Gray's lowest number.

*Plaintiff's Deficits in Adaptive Functioning*

The ALJ, however, is not solely bound by the results of an I.Q. test; instead, the ALJ must examine the I.Q. results together "with other medical evidence and the claimant's daily activities and behavior." *Popp*, 779 F.2d at 1500. The ALJ recognized that plaintiff's lowest test score at that time, the performance score of 69 from the test administered by Ms. Gray, was within range contemplated by the paragraph C criteria of listing 12.05. T. 27. Nevertheless, the ALJ, found that claimant had no significant deficits in adaptive functioning:

> The paragraph C criteria of listing 12.05 are not met. Mental retardation refers to significantly subaverage general intellectual functioning <u>with deficits in adaptive functioning</u> initially manifested during the developmental period; *i.e.*, the evidence demonstrates or supports onset of the impairment before age 22, and a valid verbal, performance, or full scale IQ of 60 through 70, and another physical or mental impairment imposing an additional and significant work related limitation of function. In December 1979, Ms. Loretta E. Gray, M.A., a school counselor, administered the WISC-R. The claimant was found to have a full scale IQ score of a 76; a verbal score of 87; and a performance score of 69, placing his lowest score in the range of 60-70, as contemplated by the listing. However, the overall evidence of record in this case clearly shows that the claimant has no significant deficits in adaptive functioning. Ms. Gray's comprehensive narrative supports her opinion that the test scores place the claimant's functioning within the borderline range of intellectual abilities. Three months later, Dr. James E. Hord, Jr., Ph.D., administered another IQ test on the claimant and he received a verbal IQ score of 100, which is considered average; however, he did score significantly lower in the sub-test digit span, which tests immediate recall. The claimant's representative requested a new I.Q. be administered. Pursuant to CFR 20 416.919a, a

consultative examination is not necessary to resolve a conflict in the record, as the current testing falls out the mental retardation range, and the record from claimant's treating sources is sufficient to allow for a determination as to the claimant's functional limitations.

Therefore, based on his above-discussed extensive activities of daily living, his ability to live independently, and his ability to use public transportation and other resources within the community the record clearly shows that the claimant has no significant deficits in adaptive functioning and a diagnosis of borderline intellectual functioning is more appropriate than mental retardation. (References to exhibits omitted).

T. 27.

With these findings in mind, the court must assess whether plaintiff's adaptive functioning assessment was supported by substantial evidence, viewed in light of the findings contained in Dr. Smith's psychological examination, now a part of the record. The question before the court, then, is whether there is substantial evidence of plaintiff's non-deficient adaptive functioning so as to allow the Commissioner to discount, or perhaps, disregard, an I.Q. score in the required 12.05C range.

This question is not novel to the court, and has been considered at length in various opinions. *Compare Culver v. Astrue*, No. 5:10cv249, 2011 WL 7039940 (N.D. Fla. Dec. 12, 2011) (positing that the ALJ appropriately determined that the evidence did not support a finding that Plaintiff's impairment meets or equals listing 12.05C, but remanding for further proceedings to determine the full extent of plaintiff's adaptive functioning; the claimant worked for twenty-seven years, supervised other people, completed reports, used machines, tools, or equipment, used

technical knowledge/skills including skills derived from specialized training with machines, and had annual income between $20,000 and $36,000), *with Monroe v. Astrue*, 726 F. Supp. 2d 1349 (N.D. Fla. 2010) (concluding that substantial evidence did not support the ALJ's finding that plaintiff's full scale I.Q. score of 62 was invalid due to a perceived higher level of adaptive functioning; the claimant had basic reading and writing skills, worked at fast food restaurants, assembled detonators, fed four dogs, did household chores, cooked occasionally, shopped for groceries with others, was able to drive a car short distances, was taking Albuterol, was prescribed Tramadol, and evidence indicated she likely used a nebulizer for her asthma).

The cases examining a disability claimant's adaptive functioning in the context of a 12.05C listing and I.Q. score are highly fact dependant, and, as a result, the outcomes vary. *See e.g., Outlaw v. Barnhart*, 197 Fed. App'x 825, 827 n.1 (11th Cir. 2006) (finding that plaintiff had an I.Q. score above 70, and "[Plaintiff] testified that he had worked for several years as an adult as a van driver, a security guard, and in the shipping and receiving department at a pecan plant. Therefore, [plaintiff's] adult IQ scores were not consistent with his daily activities."); *Markle v. Barnhart*, 324 F.3d 182, 186 (3d Cir. 2003) (holding that "[plaintiff's] ability to pay his own bills, add and subtract, use an ATM machine and to take care of all his own personal needs; [plaintiff's] ability to identify and administer his medication; his previous jobs; his obtaining a GED; and the positive evaluations of Dr. Williams, the psychologist[,]" did not amount to substantial evidence justifying the ALJ's discounting of plaintiff's valid full scale I.Q. score of 70); *Black v. Astrue*, 678 F. Supp. 2d 1250, 1261-62 (N.D. Fla. 2010) ("Two valid tests scored Plaintiff's lowest I.Q.'s at 59 and 67.

Plaintiff worked only as a laborer for Quincy Farms, a job that required only that she pick mushrooms, and lift and carry, and little else. Her ability to drive a motor vehicle short distances, to cook and take care of personal needs, and to handle cash without a bank account, is offset by her reliance upon her family and daughters for more complicated activities and help in raising her children . . . . [I]t was error to fail to conclude that Plaintiff has proved a valid I.Q. score between 60 and 70 . . . ."); *Alday v. Astrue*, No. 5:08cv217, 2009 WL 347722, at *7 (N.D. Fla. Feb. 11, 2009) (reversing for benefits because "there is no evidence here that Plaintiff was malingering or failing to make an effort on the I.Q. test[4], and the psychologist found the test scores to be valid. There are no equivocal diagnoses here. The psychologist did not find Plaintiff to be in the higher range of borderline intellectual functioning. Plaintiff's work history has been discontinuous, has not involved skilled work (parts manager, auto mechanic, cosmetology) or supervision of others . . . . Therefore, the evidence of Plaintiff's work history is not substantial evidence in the record to discount her I.Q. scores."); *Davis v. Astrue*, No. 2:07cv880-TFM, 2008 WL 2939523, at *3 (M.D. Ala. July 25, 2008) (upholding ALJ's determination of borderline intellectual functioning of plaintiff with a full scale I.Q. score of 66 because a doctor found plaintiff's adaptive behavior elevated her classification to borderline intellectual functioning, another doctor concurred that the plaintiff had a borderline level of intellectual functioning, plaintiff completed the twelfth grade, plaintiff was capable of reading, writing, and completing simple math problems, had

---

[4] Plaintiff had a full scale I.Q. score of 66. *Alday*, 2009 WL 347722, at *4.

a driver's license, had some training in cosmetology and secretarial skills, and had performed semi-skilled employment). The foregoing cases reflect the fact intensive inquiry the court must make.

Turning to the facts of the instant case, and applying the guidance provided by the decisions just discussed, the undersigned cannot find substantial evidence to support the determination by ALJ that claimant's level of adaptive functioning is inconsistent with claimant's I.Q. score. The claimant has a ninth-grade education, but was only able to academically pass through the sixth-grade. T. 48. Claimant never obtained a GED, nor was he able to receive vocational training due to learning difficulties. T. 48-49. Claimant has trouble reading most books. T. 50. Claimant's only stable job was when he was a roofer from 1994 through 2000. T. 53-54. He made $5000 a year as a roofer. T. 197. In that capacity, he neither supervised others, nor employed technical skills in his jobs. T. 204. Outside of that six year occupational period, the claimant reported he has been unemployed. At one time, claimant had a mortgage of $350 to $400. T. 55. Claimant lives with his mother, and does not pay rent or any other bills. T. 55. He is on food stamps. T. 55. Claimant noted that he feeds his cat, but his degree of self sufficiency appears rather limited. T. 178. The record does not expand upon the extent claimant cares for the cat, and ability to feed a cat would hardly be an indicator of intellectual functioning, in the context of this case. Claimant can go grocery shopping and do household chores. T. 179-80. Claimant's days consist of him lying around watching television. T. 177. His meals consist of sandwiches and frozen meals, neither of which require a great deal of effort or mental ability to make. T. 179. The Commissioner cites claimant's

ability to take public transportation as a sign of his intelligence. T. 27. Going to a bus or metro stop and waiting until the conveyance arrives, however, signals nothing more than a limited ability to follow directions and the ability to learn visual cues of when to get on and off.

The Commissioner argues that claimant demonstrates the intellectual prowess to be able to handle his medical needs. Claimant uses a sliding scale in the morning and at night to determine how much insulin he must take. T. 58. Claimant remembers how much Depakote he must take, although it is unclear whether the 500 or 1000 milligrams he takes are just single pills of the same medication. T. 63. The ALJ also took as a sign of claimant's level of adaptive functioning that he is able to measure his blood sugar and record the levels three times a day. T. 66. From the record, it appears that claimant only recorded his blood sugars levels for a temporary period and in response to instructions by his doctor. T. 66-67. Claimant also gives himself injections of either Lantus or Novolog. T. 66. These actions seem to be no more than the claimant following repetitive, simple instructions given to him by his doctor. These tasks do not change day to day, or according to circumstances. Such behavior is comparable to remembering to set an alarm to wake oneself up, or knowing how to nail shingles into a roof.

The Commissioner next identifies various medical examinations in the record to contend that claimant has adaptive functioning to justify a deviation from his I.Q. score. (Doc. 12, pp. 6-7). Dr. Horvat found the claimant to be adequately groomed and posited that the claimant has a below average intelligence based on his math and

verbal skills shown during the interview  T. 292-93.  Dr. Horvat also noted that claimant's fund of knowledge was limited by his intellect and education. T. 293.  Dr. Horvat asked a series of questions, contained herein, designed to gauge claimant's knowledge.  T. 293-94.  Claimant was able to successfully explain the difference, albeit in limited terms, between a dwarf and child, and an apple and orange.  T. 293-94.  He was also able to name several presidents and large rivers.  T. 293-94.  In his conclusion , Dr. Horvat found that claimant was able to handle his own finances and that there were "no psychological reasons why [claimant] cannot work."  Dr. Horvat's conclusion, however, does not make clear whether he is addressing plaintiff's adaptive functioning and mental intelligence, or merely finding that the psychological limitations, such as bipolar II disorder, are not so severe as to prevent claimant from working.  It is also noteworthy that Dr. Horvat did not make a formal finding of claimant's intelligence regarding mental retardation or borderline intellectual functioning, instead finding only that claimant possessed below average intelligence. T. 294.  Dr. Horvat also did not administer a formal intelligence test, and appeared to utilize the series of questions he posed and his conversation with claimant as the basis for his findings.  In a slightly different set of observations, the claims adjudicator found claimant to have noticeable problems "remember[ing] information, such as jobs, medical, etc[,]" speaking at a normal pace, and seeming to "just stare" off.  T. 167.  The claims adjudicator also observed claimant was wearing worn clothing and did not appear to be very clean.  T. 167.

   The Commissioner also contends that Dr. Alberts' lack of notes discussing claimant's mental impairments is a sign that claimant has no mental impairments.

(Doc. 12, p. 6). Dr. Alberts' failure to mention that the claimant possesses limited intelligence does not necessarily mean the claimant does not have limited intelligence. Dr. Alberts evaluated the claimant in the context of a referral for homicidal ideation and agitation, not in order to gauge his mental intelligence. Thus, it is likely that Dr. Alberts chief concern was gauging the claimant's overall mental state and his likelihood of criminal activity.

Analogous reasoning applies to Dr. Patterson's findings regarding the claimant. Dr. Patterson noted that claimant's reading and writing were within normal limits and that claimant had a fair fund of knowledge, but Dr. Patterson was evaluating for a complaint of back pain. T. 379-80. Dr. Patterson was not attempting to determine the extent of claimant's mental prowess.

In contrast, Dr. Smith, who to date is the only licensed psychologist or doctor to analyze claimant solely for the purpose of discerning his mental capability and I.Q. score in the last thirty years, noted "[e]xtremely Low performance on the standardized IQ test and concurrent deficits in adaptive functioning indicate [claimant] meets criteria for Mild Mental Retardation." T. 415. Dr. Smith further noted that claimant's limitations suggest that he would have problems learning or performing semi-skilled tasks, and that claimant is not competent to manage funds.[5] T. 415.

---

[5] That Dr. Smith conducted testing well after claimant reached adulthood is of no consequence. In *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir.2001), the Eleventh Circuit held that "absent evidence of sudden trauma that can cause retardation, the IQ tests create a rebuttable presumption of a fairly constant IQ throughout her life." 276 F.3d at 1268. " [A] claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she presented evidence of low IQ test results after the age of twenty-two." *Id*. at 1266.

It appears that many of the mental intelligence conclusions relied on by the Commissioner are from doctors primarily concerned with claimant's health in some other respect than thoroughly examining his mental intelligence and adaptive functioning. Of the group, Dr. Horvat's mental diagnosis appears to be the most thorough, and his conclusions appear from the record to be based on a conversation and series of questions he had with the claimant. Dr. Horvat's notes do not indicate specific tests he performed on claimant attempting to assess mental intelligence. For the reasons stated in the preceding paragraphs, the evidence from the above sources addressing claimant's adaptive functioning levels and mental intelligence does not overcome the evidence presented regarding claimant's daily behavior and Dr. Smith's mental examination.[6]

Those cases reviewed above affirming denial also present characteristics that are notably absent from the instant case. Claimant has an I.Q. score in the required range, was never promoted past the ninth-grade, never received a vocational degree or his GED, only worked for about six years at a minimal wage as a roofer, never supervised anyone, and never had any technical or specialized training. The only real evidence of any sort of advanced adaptive functioning is related to his ability to make

---

[6] Another contention the Commissioner makes is that the claimant was found to have borderline intellectual functioning and therefore cannot simultaneously have mental retardation. (Doc. 12, p. 5). This argument is unconvincing. The Commissioner cites *Jordan v. Comm'r of Soc. Sec. Admin.*, for the proposition that the two diagnoses are distinct. 470 Fed. App'x 766, 768-69 (11th Cir. 2012). While the contention itself is true, both are distinct diagnoses, the information presented to the court leads the undersigned to conclude that Dr. Smith's diagnosis of mental retardation is the most accurate. With that in mind, the question again would be whether the Commissioner's decision regarding claimant's level of adaptive functioning was supported by substantial evidence.

simple meals, grocery shop, take public transportation, feed his cat, take his daily medicine, and monitor his blood sugars giving himself injections when needed.

This case is most similar to *Monroe*, a case in which the court reversed the Commissioner and awarded benefits. 726 F. Supp. 2d at 1350. In *Monroe*, the claimant had a verbal I.Q. score of 66, performance score of 64, and full scale I.Q. score of 62. 726 F. Supp. 2d at 1353. The *Monroe* claimant worked as a fast food worker and detonator assembler, neither of which appear to be a supervisory role or occupation that requires specialized training. *Id.* at 1352. Similar to Mr. Willis, who takes care of a cat, the *Monroe* claimant took care of four dogs. *Id*. Further, the *Monroe* claimant was also prescribed medication and had to operate a breathing machine (likely a nebulizer). *Id*. Like the claimant in the instant case, the *Monroe* claimant also did not graduate from high school nor obtain any specialized vocational training, did household chores, shopped for groceries (albeit with assistance), could operate a motor vehicle, and did cook for herself on occasion. *Id.* at 1352, 1357. In contrast to the present case, in *Monroe* no expert had stated that the claimant was in the borderline level of functioning instead of mentally retarded. *Id.* at 1357. Here, however, Ms. Gray found that the claimant was in the borderline level of functioning. T. 402. The undersigned has already addressed the merits and weight afforded to Ms. Gray's conclusions, but will again note that Ms. Gray was a school counselor, while Dr. Smith is a licensed psychologist with a Ph.D. Nothing in the record suggests that the school counselor was an expert in mental intelligence and adaptive functioning assessment. Also, Dr. Hord did not make a diagnosis of mental retardation or borderline level of intellectual functioning. T. 405-06. Likewise, Dr. Horvat's

diagnosis states only that claimant is of "below average intelligence," a classification that rules out neither mental retardation nor borderline intellectual functioning. T. 294. After a thorough review of the record, examination of the analysis employed in similar cases, and consideration of the various factors underlying the ALJ's decision in the instant case, the undersigned finds that the ALJ's decision regarding adaptive functioning was not supported by substantial evidence in light of Dr. Smith's conclusions, and the plaintiff's daily activities.

*Plaintiff's Physical or Other Mental Impairment*

Under § 12.05C, in addition to "[a] valid verbal, performance, or full scale IQ score of 60 through 70[,]" a claimant must also have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." § 12.05C. In the present case, the ALJ found the claimant had numerous severe impairments: "bipolar disorder; depression; pain disorder; degenerative disc disease at L5-S1 with no acute processes; right sided neural foraminal narrowing T11-T12 related to a right paracentral disc bulge; diabetes mellitus with peripheral neuropathy; polysubstance abuse; and borderline intellectual functioning." T. 24. After review of the parties' briefs, the court notes that neither the claimant nor the Commissioner dispute the ALJ's characterization of plaintiff's severe impairments.[7]

---

[7] The plaintiff, in his initial memorandum of law (doc. 9), contends only that the ALJ failed to address the issue of additional significant physical or mental work-related limitations and that he does in fact have these severe limitations. (Doc. 9, p. 14). Plaintiff's claim goes unaddressed in the government's response (doc. 12).

"A 'severe' impairment at step 2 is a condition which has more than a 'minimal effect on [plaintiff's] ability to: walk, stand, sit, lift, push, pull, reach, carry, or handle, etc.'" *Black v. Astrue*, 678 F. Supp. 2d 1250, 1262 (N.D. Fla. 2010) (*quoting Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985). "The 'work-related limitation of function' intended by Listing 12.05C is the same form of impairment." *Black*, 678 F. Supp. 2d at 1262. In *Black*, the court found that the ALJ's determination that plaintiff had two severe impairments at step 2 precluded a finding that the plaintiff did not have "'a physical or other mental impairment imposing an additional and significant work-related limitation of function[.]'" 678 F. Supp. 2d at 1262; *see also Etheridge v. Astrue*, No. 08-00357-WS-B, 2009 WL 3233899, at *11 (S.D. Ala. Sept. 29, 2009) ("At Step 2, the ALJ found that Plaintiff has severe impairments of post traumatic stress syndrome, borderline intellectual function, bursitis of the left hip and back pain. Accordingly, in finding these severe impairments to exist, the ALJ necessarily found that Plaintiff has 'a physical or other mental impairment imposing an additional and significant work-related limitation of function.'") (citations omitted); *Carroll v. Astrue*, No. 1:08CV74-SRW, 2009 WL 1708073, at *2 (M.D. Ala. June 17, 2009) (holding that because the ALJ found plaintiff to be suffering from the severe impairment of hypertension, the ALJ's determination that plaintiff "does not have another impairment" for 12.05C purposes is legally inadequate) (citations omitted). Here, as set out above, the ALJ made numerous findings of severe impairments. These determinations, therefore, necessarily indicate that plaintiff meets the 12.05C requirement of "a physical or other mental impairment imposing an additional and significant work-related

limitation of function."[8]   § 12.05C; *see also Black*, 678 F. Supp. 2d at 1262-63.

*Remedy*

Turning to the broader picture, it is important to recapitulate the conclusions of the court at this juncture.  For a claimant to satisfy listing 12.05C there must be: 1) a valid verbal, performance, or full scale IQ of 60 through 70; 2) the IQ score must be accompanied by deficits in adaptive functioning; and 3) these requirements must both be accompanied by a physical or other mental impairment imposing an additional and significant work-related limitation of function.   § 12.05C.   In summary, the court has determined that Dr. Smith's conclusion that plaintiff has an I.Q. score of 53 is the score supported by substantial evidence in the record, that the ALJ's finding that plaintiff does not have the needed deficits in adaptive functioning is unsupported by substantial evidence, and that the plaintiff does have a physical or other mental impairment imposing an additional and significant work-related limitation of function.   In short, substantial evidence does not support the Commissioner's determinations in this matter.

With these conclusions in mind, the next issue for the court is whether remand or reversal for benefits is the appropriate remedy.  "Reversal is warranted where the

---

[8]   For thoroughness purposes, any of the severe impairments found by the ALJ, "bipolar disorder; depression; pain disorder; degenerative disc disease at L5-S1 with no acute processes; right sided neural foraminal narrowing T11-T12 related to a right paracentral disc bulge; diabetes mellitus with peripheral neuropathy; polysubstance abuse; and borderline intellectual functioning[,]" T. 24, could have more than a "minimal effect" on the plaintiff's ability to "walk, stand, sit, lift, push, pull, reach, carry, or handle, etc."  *Black*, 678 F. Supp. 2d at 1262-63 (analyzing the "minimal effect" threshold and finding that right eye blindness and degenerative disc disease surpass that threshold).

record is fully developed and, upon the application of the correct legal standards, the claimant is entitled to benefits." *Durham v. Apfel*, 34 F. Supp. 2d 1373, 1381 (N.D. Ga. 1998) (*citing Carnes v. Sullivan*, 936 F.2d 1215, 1219 (11th Cir. 1991)). The undersigned recommends that under the correct legal standards, claimant is entitled to benefits. Before incorporating this into the ultimate recommendation, however, the court must assure itself that the record is fully developed.

The direct way to discern any gaps in the record will involve analysis of the requirements needed to satisfy listing 12.05C, in the context of the question of whether more information would better enlighten the court. The first consideration, I.Q. score, is already well-represented in the record. There are three separate I.Q. scores contained in the record, including two full I.Q. examinations. Importantly, while this opinion has devoted a great deal of time toward analyzing the plaintiff's I.Q. score, the parties do not. (Doc. 9; Doc. 12; Doc. 14). In fact, review of the ALJ's decision reveals that the ALJ recognized plaintiff's I.Q. score is in the required range for 12.05C, "[t]he claimant was found to have a full scale IQ score of a 76; a verbal score of 87; and a performance score of 69, placing his lowest score in the range of 60-70, as contemplated by the listing." T. 27. Similarly, the Commissioner also accepts this fact and does not contest plaintiff's I.Q. score, "[t]he ALJ acknowledged Plaintiff's 1979 performance I.Q. score of 69." (Doc. 12, p. 5). Because the parties openly recognize that the plaintiff is in the required range, there are several valid I.Q. scores in the record, and the Commissioner does not dispute the findings of Dr. Smith, remand for further I.Q. testing would be futile.

With regard to potential supplemental evidence or findings concerning plaintiff's "physical or other mental impairment imposing an additional and significant work-related limitation of function," the ALJ has already determined under step 2 that plaintiff has severe impairments. T. 24. The parties do not contest this fact in their pleadings, and the ALJ's determinations at step 2 indicate that plaintiff meets the level of impairment for 12.05C. *See Black*, 678 F. Supp. 2d at 1262. Accordingly, remand for further investigation into this issue is unwarranted.

Finally, turning to the issue of deficits in adaptive functioning, it is unclear what additional information could be discovered that would better illuminate the plaintiff's level of adaptive functioning. The plaintiff has undergone various mental and psychological examinations by numerous doctors and psychologists over the last several years. The plaintiff also underwent a hearing before the ALJ further clarifying his daily activities and behavior. Also present in the record are Function Reports, one completed by the plaintiff and one by his mother, detailing his daily activities and behavior. The record appears to contain a more than adequate amount of information about the plaintiff. The result on remand would be greater expense for all the parties involved, including the court, for an outcome that will not change. It is the undersigned's considered view that the record is fully developed for the purposes of this case. Reversal is, therefore, the proper remedy here.

Accordingly, it is respectfully RECOMMENDED:

The applications for disability insurance benefits and supplemental security income be REVERSED and the Commissioner be ORDERED to grant Plaintiff's application for benefits.


At Pensacola, Florida, this 26th day of November, 2012.


*/s/ Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>.  A copy of any objections shall be served upon the magistrate judge and all other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).